UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------ x
UNITED STATES OF AMERICA          :
                                  :
    - against -                   :      13 Crim. 142 (PAC)
                                  :
ALONZO JACKSON,                   :      OPINION & ORDER
                                  :
          Defendant.              :
------------------------------------------------------ x

USDC SNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  September 4, 2013

HONORABLE PAUL A. CROTTY, United States District Judge:

On February 28, 2013, defendant Alonzo Jackson ("Jackson") was indicted on a single count of being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1). The Indictment also cites Jackson's three previous convictions in state court for criminal sales of a controlled substance in the third degree, a Class B felony under New York law. These convictions serve as the basis for invoking the Armed Career Criminal Act ("ACCA"), which, if applicable, would impose a minimum sentence of 15 years imprisonment. The ACCA applies where a defendant has previously been convicted of three "serious drug offense[s]," 18 U.S.C. § 924(e)(1), which are defined as "offense[s] under state law, involving . . . distributing . . . a controlled substances . . . for which a maximum term of imprisonment of ten years or more is prescribed by law." 18 U.S.C. § 924(e)(2)(A)(ii).

Jackson has not indicated whether he intends to plead guilty. He now moves for a pretrial ruling regarding whether the applicability of the ACCA's sentencing enhancements will be determined based on the sentences that applied at the time of his prior convictions or the maximum sentences that apply to those crimes today. The Government contests both the ripeness and the merits of Jackson's motion. For the following reasons, the Court finds that Jackson's challenge is ripe and that the ACCA's sentencing enhancements are not applicable.

## DISCUSSION

**I.      Ripeness**

The Government argues that issues relating to Jackson's potential maximum and minimum sentences are not ripe for adjudication because he has not yet stated his intention to plead guilty. It relies primarily on U.S. v. Santana, 761 F. Supp. 2d 131 (S.D.N.Y. 2011), in which 41 defendants were charged with participating in a drug conspiracy. The defendants in Santana moved for a determination on whether provisions of the Fair Sentencing Act of 2010 ("FSA") were applicable to their sentences. Not all defendants were similarly situated, however, as some defendants had already pled guilty, others had not and had not represented that they intended to do so, and one had not yet entered a guilty plea but stated that he would do so if the FSA applied to him.

Judge Karas held that for those who had not already pled guilty and had not indicated their intention to do so, "a live controversy does not yet exist (and the issue is not yet 'fit' for judicial decision) . . . unless and until sufficient facts are developed or stipulated." Id. at 141. Specifically, factual questions remained regarding the quantity of narcotics that each individual defendant could be found to have distributed or conspired to distribute, which would determine whether the offense for which they might be convicted subjected them to the FSA's mandatory minimum sentencing provisions. Id. at 140-41. With respect to the defendant who had represented that he would plead guilty if the FSA applied to him, Judge Karas found the FSA's applicability "fit for adjudication because no contingencies exist (other than the possibility of acquittal if he chose to go to trial) that would render a decision as to the FSA's applicability to him advisory, and no further facts [would] be established by delay in the Court's decision." Id. at 142.

Jackson has not expressed an intention to plead guilty; but otherwise, he is in the same position as that lone defendant in Santana because there are no further factual questions that preclude the Court from determining the mandatory minimum sentence that he faces. As then-District Judge Cabranes held, "[w]hile it may appear to be . . . unusual" to determine the applicable mandatory minimum sentence where a defendant has "not yet decided to plead guilty," a defendant's failure to state his intention, standing alone, does not make the issue unfit for review. U.S. v. Monocchi, 836 F. Supp. 79, 82-83 (D. Conn. 1993).

Whether Jackson's prior convictions constitute "serious drug offenses" is fit for judicial review because it is a "purely legal [issue], and will not be clarified by further factual development." Thomas v. Union Carbide Agric. Prods, 473 U.S. 568, 581 (1985). Jackson's decision "as to whether to proceed to trial or enter a guilty plea can and will be affected by a determination of whether [18 U.S.C. § 924] will be applied to him," U.S. v. Perez, 696 F. Supp. 55, 56 (S.D.N.Y. 1988), but, assuming *arguendo* that he is eventually found guilty, whether his guilt results from his own plea or from conviction by a jury would have no bearing on the interpretation or application of 18 U.S.C. § 924.

Though the Government contends that this issue is not ripe, it does not argue that a merits decision by the Court would cause it hardship. Declining to address the issue, however, would lead to "uncertainty create[ing] a considerable hardship for the defendant" because of the "disparity between the possible range of sentences" that might apply.[1] U.S. v. Cortes, 697 F. Supp. 1305, 1307 (S.D.N.Y. 1988); see also U.S. v. Caparotta, 890 F. Supp. 2d 200, 211 n.12 (E.D.N.Y. 2012). Without the benefit of the Court's ruling, in determining whether to plead

---

[1] Judge Karas declined to address "whether uncertainty as to a plea constitutes sufficient 'hardship' to make [the] issue ripe," Santana, 761 F. Supp. 2d at 141, but noted in *dicta* that "[t]here is certainly a viable argument that a question of law relating to a defendant's potential mandatory minimum sentence *must* be resolved . . . in the case of a Defendant *considering* a guilty plea." Id. at 142 (collecting cases) (emphasis added).

guilty Jackson "would effectively be playing a game of 'Russian Roulette:' it is possible that [he] might be pleading to a mandatory minimum sentence, but it is also possible that [he] would not face such a mandatory minimum term," a "difficult situation" that "[t]he Court can readily avoid . . . by addressing the question raised." Monocchi, 836 F. Supp. at 83.  In many cases, additional hardships caused by uncertainty regarding the applicable mandatory minimum sentence might include how that uncertainty "affect[s] a Defendant's trial strategy (i.e. a Defendant might attempt to avoid conviction only on [certain] offenses . . .) and the advice given by defense counsel as to the consequences of a potential guilty plea." Santana, 761 F. Supp. 2d at 142 n.15; cf. Lafler v. Cooper, 132 S.Ct. 1376, 1384 (2012) ("During plea negotiations defendants are 'entitled to the effective assistance of competent counsel.'" (quoting McMann v. Richardson, 397 U.S. 759, 771 (1970)).

On the other hand, "[n]othing would be gained by postponing a decision." Thomas, 473 U.S. at 582.  "It is beyond dispute that a guilty plea must be both knowing and voluntary," Parke v. Raley, 506 U.S. 20, 28 (1992), which, *inter alia*, requires district courts to inform defendants of, and ensure that they understand, "any maximum possible penalty" and "any mandatory minimum penalty" before the Court may accept their guilty plea. Fed R. Crim P. 11(b)(1)(H)-(I).  "Because the defendant must be aware of the possible sentence to be imposed in order to plead intelligently, the Court's ruling on this motion will not be an advisory opinion." U.S. v. Sanders, No. 88 Crim. 141, 1988 WL 107377, *1 (N.D. Ill. Oct. 4, 1988).  Further, it is unclear how the public interest would be served by refusing to inform Jackson of the mandatory minimum sentence that he faces unless and until he appears before the Court to enter a guilty plea, rather than allowing him to take all information regarding sentencing into account while considering how to plead.  Accordingly, the Court determines that Jackson's motion is ripe.

**II.     The ACCA**

In applying the ACCA to narcotics crimes, "Congress chose to rely on the 'maximum term of imprisonment . . . prescribed' by state law as the measure of the seriousness of state offenses," based on the presumption that "if state lawmakers provide that a crime is punishable by 10 years' imprisonment, the lawmakers must regard the crime as 'serious.'"  U.S. v. Rodriquez, 553 U.S. 377, 388 (2008) (quoting 18 U.S.C. § 924(e)(2)(A)(ii)).  At the time of Jackson's prior convictions, his sentences were governed by the "Rockefeller Drug Laws" and carried a maximum sentences of twenty-five years' imprisonment.  New York has since enacted several Drug Law Reform Acts, including the Drug Law Reform Act of 2009 (the "2009 DLRA"), which lowered the current maximum sentence for class B felonies such as Jackson's to nine years.  N.Y. Penal Law § 70.70(a)(2)(i).  The 2009 DLRA also allowed those previously convicted of Class B felonies under the Rockefeller Drug Laws to apply for resentencing under certain conditions.[2]  See N.Y. Crim. Proc. Law §440.46(1).  If Jackson's prior convictions had occurred after the 2009 DLRA or if he had been resentenced under it, there is no question that ACCA would not apply.

McNeill v. U.S., 131 S.Ct. 2218 (2011), dealt with a similar set of facts.  In McNeill, a defendant pled guilty to the unlawful possession of a firearm by a felon, after having previously been convicted in North Carolina state court for six drug trafficking convictions between 1991 and 1994, for which he received the then-maximum sentence of 10 years.  North Carolina subsequently reduced the maximum sentence for each of his prior convictions to less than four years.  The Supreme Court unanimously held that, in applying the ACCA, "a federal sentencing court must determine whether 'an offense under state law' is a 'serious drug offense' by

---

[2] As discussed *infra* at 7-8, Jackson is not eligible for resentencing under the 2009 DLRA.

consulting the 'maximum term of imprisonment' applicable to a defendant's previous drug offense at the time of the defendant's state conviction for that offense." Id. at 2224 (quoting 18 U.S.C. § 924(e)(2)(A)(ii)).  In doing so, it specifically rejected the approach adopted by the Second Circuit in U.S. v. Darden, 539 F.3d 116 (2d Cir. 2008), under which district courts were to look at the current state law at the time of federal sentencing in determining the maximum time prescribed for the offense.  See McNeill, 131 S.Ct. at 2221.  McNeill noted, however, that it was not addressing "a situation in which a State subsequently lowers the maximum penalty applicable to an offense and makes that reduction available to defendants previously convicted and sentenced for that offense."  Id. at 2224 n.1.  Indeed, in McNeill the Government conceded that "if a State subsequently lowered the maximum penalty and made that reduction available to defendants previously sentenced as of the same date as the defendant now at issue, the defendant could plausibly look to that reduced maximum as stating the law applicable to his previous conviction."  Gov't Br., McNeill v. U.S., No. 10-5258, 2011 WL 1294503, at 18 n.5 (filed Mar. 29, 2011).  That is precisely the situation in which Jackson finds himself.

The Government's reliance on U.S. v. Rivera, 716 F.3d 685 (2d Cir. 2013), is unavailing.  The Second Circuit applied McNeill to a defendant sentenced pursuant to the ACCA based on prior New York state court convictions for, *inter alia*, attempted criminal sale of a controlled substance in the third degree, a Class C felony.  With respect to the defendant's prior Class C felony conviction, Rivera held that "the New York sentencing schemes mirror[ed] those addressed in McNeill because their provisions do not retroactively change the maximum sentence applicable to [his] drug conviction."  Id. at 690.  While Rivera recognized that "some provisions of the 2009 DLRA apply retroactively," the retroactive provisions were inapposite because the defendant's "sole drug-related offense was a class C felony."  Id.  In contrast,

Jackson has been previously convicted only of Class B felonies, which are subject to the 2009 DLRA's resentencing provisions. Id. at 688. Jackson's motion therefore presents a matter of first impression not addressed by either McNeill or Rivera.

The Government argues that the 2009 DLRA is not retroactive with respect to Jackson because he is not eligible for resentencing. Specifically, the 2009 DLRA's resentencing provisions require, *inter alia*, that the applicant for resentencing be "in the custody of the department of corrections" while "serving an indeterminate sentence with a maximum term of more than three years." N.Y. Crim. Proc. Law § 440.46(1); see also People v. Overton, 923 N.Y.S.2d 619, 625 (App. Div. 2011). Jackson is not currently incarcerated, having been released from prison on December 29, 2005, and discharged from parole on December 6, 2007. But Jackson is not applying to be resentenced for his prior convictions and McNeill does not require that he be eligible for resentencing based upon the retroactive modification of the laws under which he was convicted. Rather, to fit within the question left open by McNeill, the subsequent change in law must only be "available to defendants previously convicted and sentenced." McNeill, 131 S.Ct. at 2224 n.1. The 2009 DLRA allows for the retroactive modification of sentences for Class B felonies, even it does not do so for Jackson in particular.

Moreover, the DLRA and ACCA must be interpreted "to avoid[] absurd results." McNeill, 131 S.Ct. at 2223; see also Majerowitz v. Stephen Einstein & Assocs., P.C., No. 12 Civ. 4592, 2013 WL 4432240, *4 (E.D.N.Y. Aug. 15, 2013) ("'Consequences cannot alter statutes, but may help to fix their meaning. Statutes must be so construed, if possible, that absurdity and mischief may be avoided.'" (quoting In re Rouss, 221 N.Y. 81, 91 (1917)). "Beginning in 2004, the New York state legislature enacted a series of laws" reforming the Rockefeller Drug Laws. Rivera, 716 F.3d at 687. "The purpose of the 2009 DLRA, like that of

its predecessors, the 2004 and 2005 DLRAs, was to grant relief from what the Legislature perceived as the 'inordinately harsh punishment for low level non-violent drug offenders' that the Rockefeller Drug Laws required." People v. Paulin, 17 N.Y.3d 238, 244 (2011) (quoting Assembly Sponsor's Mem., Bill Jacket, L. 2004, ch. 738, at 6); see also U.S. v. Darden, 539 F.3d at 127 (quoting former New York Governor Pataki: "The Rockefeller Drug Laws allow non-violent drug offenders to be more severely punished than rapists.  We need to change that."). The "legislation was designed to authorize a more lenient, and more therapeutic, judicial response to all but the most serious drug crimes," People v. Danton, 27 Misc.3d 638, 644 (N.Y. Sup. Ct. 2010), in recognition of the "extraordinary public costs, both human and economic, [of] the extended incarceration of low-level drug offenders." People v. Sosa, 18 N.Y.3d 436, 442 (2012).

Although the 2009 DLRA does not expressly apply to those who have already served their sentence, there is no question that, "[b]y lowering the sentences in certain instances and providing other forms of amelioration," its purpose was to bring "sentences more in line with [New York's] present view of the seriousness of the crimes." U.S. v. Hammons, 438 F. Supp. 2d 125, 130 (E.D.N.Y. 2006).  The Government does not offer any plausible explanation for why New York's legislature intended to apply the 2009 DLRA's sentencing modifications retroactively to those who are still incarcerated, but to deprive those who have already been released from prison of its ameliorative effect.  Nor does it make sense to apply the ACCA to Jackson, but not to a more recently convicted criminal only because Jackson's conviction is older and his sentence has been served.  In contrast, Jackson argues persuasively that the reason for this discrepancy is self-evident: "Making resentencing available to defendants who had completed their sentences would be nugatory as it would have no practical effect whatsoever."

(Def. Opp'n at 4.) Depriving Jackson of the benefits of the 2009 DLRA's retroactive application because he has already finished serving his previous sentences and cannot apply to be resentenced is the sentencing equivalent of kicking a man when he is down. It might "satisfy the strict letter of the law but certainly not its spirit or intent." Ashbacker Radio Corp. v. FCC, 326 U.S. 327, 331 (1945); cf. People v. Danton, 36 Misc.3d 898, 903 n.3 (N.Y. Sup. Ct. 2012) (non-incarcerated parolee eligible for resentencing); People v. Pomales, 35 Misc.3d 444, 446-49 (N.Y. Sup. Ct. 2012) (same); but see People v. Lankford, 35 Misc.3d 418, 422-23 (N.Y. Sup. Ct. 2012) (non-incarcerated parolee ineligible for resentencing).

In McNeill, the Supreme Court was concerned that if the ACCA's application was dependent on state law at the time of the ACCA prosecution, rather than the time of the predicate state convictions, it "would make [the] ACCA's applicability depend on the timing of the federal sentencing proceeding," noting that there was no principled explanation for "why two defendants who violated § 922(g) on the same day and who had identical criminal histories . . . should receive dramatically different federal sentences solely because one's § 922(g) sentencing happened to occur after the state legislature amended the punishment for one of the shared prior offenses." McNeill, 131 S.Ct. at 2223-24. Where the state law's sentencing modifications apply retroactively, this logic strongly suggests that the ACCA's application should be dependent on the revised state sentencing provisions for both defendants in the Supreme Court's hypothetical. As the Second Circuit has explained,

> There are some crimes that are more or less serious depending on the timing of the offense conduct. But a drug crime is not plausibly in this category. The [2004 DLRA], and its legislative history, amply confirm that New York does not view drug crimes committed before January 13, 2005, as 'more serious' than drug crimes committed after that date.

Darden, 539 F.3d at 126. Similarly, there is no reason for Jackson to be punished more harshly

because he was sentenced prior to the 2009 DLRA, as compared to an identical defendant who committed precisely the same crime, but was sentenced after the 2009 DLRA's enactment or one who remained incarcerated and therefore was eligible to apply for resentencing under the 2009 DLRA. Although "McNeill abrogated Darden," Rivera, 716 F.3d at 690, both cases dealt with non-retroactive sentencing modifications.[4] Neither case governs the instant matter, but that portion of Darden's rationale remains persuasive and applies with equal force to the 2009 DLRA. Although Jackson is not now eligible for resentencing, in light of the 2009 DLRA's generally retroactive nature with respect to Class B felonies and "the consistent view of . . . state lawmakers . . . that the Rockefeller [Drug Laws] were too severe, then as now," Darden, 539 F.3d at 127, Jackson's prior state law convictions do not qualify as predicate convictions for ACCA purposes

## .CONCLUSION

For the foregoing reasons, Jackson's state law convictions do not trigger the ACCA's sentence enhancements. The motion is GRANTED and the Clerk of Court is directed to terminate docket number 7. A status conference is scheduled to go forward on Thursday, September 19, 2013 at 2:00 PM in Courtroom 11-D. The time under the Speedy Trial Act, 18 U.S.C. § 3161(h)(7)(A), from September 4, 2013 through September 19, 2013 is excluded.

Dated: New York, New York
      September 4, 2013

SO ORDERED

*[signature]*
PAUL A. CROTTY
United States District Judge

---

[4] The Second Circuit acknowledged that the 2004 DLRA was not retroactive but "d[id] not consider the state's non-retroactivity decision significant." Darden, 539 F.3d at 127; see also id. ("In sum, there is no reason to believe that the nonretroactivity of the Reform Act reflects a state legislative view that pre-[DLRA] drug felonies were categorically more serious than those taking place after it was enacted." (internal quotation omitted)).